# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## Winston Salem Division

BRONAL GARY, *on behalf of himself and all individuals similarly situated,*

Plaintiff,

v.

KATHLEEN WOODEN KNIFE, ELIZABETH LISA WHITE PIPE, TONIA MARSHALL, LOUIS WAYNE BOYD, DOLORES WALN, CHRIS EAGLE BEAR, TODD J. BEARSHIELD, EVASTINE WRIGHT, STANLEY WOODEN KNIFE, MICHELLE HOLLOW HORN BEAR, ROYAL YELLOW HAWK, ROBERT RATTLING LEAF, WILLIAM MARSHALL, WAYNE FREDERICK, EMILY BOYD-VALANDRA, ALVIN BEAR HEELS SR., TAMALEON WILCOX, MICHAEL BOLTZ SR., SHERE WRIGHT, LILA KILLS IN SIGHT, WILLIAM KINDLE, BEN BLACK BEAR III, MARION LITTLE THUNDER, CHARLES DUBRAY JR., ROSEBUD LENDING DRT d/b/a, MY QUICK WALLET, JOHN DOES No. 1-15,

Defendants.

Civil Action No. 1:25-cv-01044

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

Plaintiff Bronal Gary, *on behalf of himself and all individuals similarly situated*, by counsel, and for his First Amended Complaint against Defendants, alleges as follows:

## INTRODUCTION

1. Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id.* This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as a "rent-a-tribe" scheme, a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

2. Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions on usurious lending go searching for a tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity. The tribal lending model also allows the identities of the primary beneficiaries to be concealed.

3. Federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

4. In this case, Defendant DRT Rosebud Lending d/b/a MyQuickWallet.com ("MQW") holds itself out as a tribal lending entity owned and operated by the Rosebud Sioux Tribe ("Tribe"). Although MQW's loans are subject to North Carolina's usury laws, MQW issued a loan to Plaintiff—a resident of North Carolina—for $500 at an interest rate of 1095%, ***more than 136 times*** North Carolina's 8-percent interest-rate cap and ***more than 68 times*** the cap for payday loans of 16%. N.C. Gen. Stat. § 24-1, 24-1-1(c). Neither the Tribe's immunity, nor its own poverty permits its entities from violating North Carolina's usury laws, which the General Assembly has proclaimed as a "paramount public policy of North Carolina." N.C. Gen. Stat. § 24–2.1.

5. In addition to Defendant MQW, Plaintiff has named the Tribal Council—Kathleen Wooden Knife, Elizabeth White Pipe, Tonia Marshall, Louis Wayne Boyd, Dolores Waln, Chris Eagle Bear, Todd J. Bearshield, Evastine Wright, Stanley Wooden Knife, Michelle Hollow Horn Bear, Royal Yellow Hawk, Robert Rattling Leaf, William Marshall, Wayne Frederick, Emily Boyd-Valandra, Alvin Bear Heels, Sr., Shere Wright, Michael Boltz, Sr., Tamaleon Wilcox, Lila Kills in Sight, William Kindle, Ben Black Bear

III, Marion Little Thunder, and Charles Dubray, Jr. (collectively, the "Tribal Council Defendants")—as the defendants in this case.

6. Plaintiff has named these individuals because the Tribe—and, in turn, MQW—is controlled and directed by a Tribal Council, who are sued here in both their official and individual capacities, as outlined below. The Tribe's Constitution established the Tribal Council as the Tribe's "governing body" with the power to, in relevant part: "make all economic affairs and enterprise of the Tribe in accordance with the terms of a charter which may be issued by the Tribe by the Secretary of the Interior"; "regulat[e] the conduct of trade"; and "charter subordinate organizations for economic purposes and to regulate the activities of all cooperative associations of members of the Tribe." Tribe Const. art. IV § 1. Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including MQW and at least two of its other usurious lending entities, Riverstone Lending and Three Sticks Lending.

7. The Tribal Council members are the proper party for several claims because the Supreme Court has repeatedly held that "tribal immunity does not bar" a "suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017). For these reasons, the Fourth Circuit has recently rejected similar arguments from tribal officials and

confirmed that "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021).

8. In short, this lawsuit challenges the legality of the Tribe's high-interest loans and seeks damages and declaratory relief against Defendants and their co-conspirators participating in this illegal scheme, including those whose identities have been deliberately concealed. More specifically, Plaintiff seeks: (1) monetary damages against MQW; and (2) prospective relief against the Tribal Officials *in their official capacity*. Plaintiff further seeks a declaratory judgment that his and other class members' loans are void and the governing law clause and arbitration provisions are void and/or unenforceable.

9. Although holding itself out as an entity wholly owned and operated by the Tribe, it is alleged and believed that MQW is largely managed by yet-to-be identified non-tribal coconspirators, the "John Doe Defendants", who provide the day-to-day management, operation, investment, and customer service functions of MQW from facilities located off of the Tribe's reservation. For now, Plaintiff has added these unknown defendants under the name "John Doe Defendants," and will seek discovery to uncover their identities.

## JURISDICTION

10. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367. Upon information and belief, the Court also has jurisdiction over all claims under the Class Action Fairness Act because the amount in

controversy far exceeds $5 million dollars when considering both the monetary and declaratory relief sought and Plaintiff is a resident of a different state from any Defendant. 28 U.S.C. § 1332.[1]

11. This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

12. The Court also has personal jurisdiction over the Defendants under North Carolina's long-arm statute and because exercising personal jurisdiction comports with due process. As to MQW, it has a substantial connection to North Carolina through the following conduct: (1) the making and collecting of loans made to North Carolina residents, including Plaintiff, who supplied his North Carolina address when he applied for the loan; (2) running marketing and advertisements that can be seen in North Carolina; (3) solicitation of borrowers in North Carolina, including through lead generation and

---

[1] Although the amount in controversy is unknown at this time, other cases against members of this industry demonstrate that the amount easily exceeds $5 million. *E.g., Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, ECF No. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $18.5 million in cash and $170 million in debt relief to borrowers); *Galloway v. Williams*, No. 3:19-cv-470, ECF No. 115 (E.D. Va. Dec. 18, 2020) (approving settlement providing $8.7 million in cash and over $100 million dollars in debt relief for over 300,000 consumers); *Gibbs v. TCV V, L.P.*, No. 3:19-cv-789, ECF No. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $50 million in cash and $380 million in debt relief to borrowers).

telephone calls with North Carolina residents located in North Carolina; (4) arranging for the collection of payment in or sent from North Carolina.

13. Similarly, the Tribal Council Defendants—who are the governing body and have control over MQW—have a substantial connection to North Carolina through the following conduct: (1) overseeing and authorizing loans made to North Carolina residents; (2) running marketing and advertisements that can be seen in North Carolina; (3) MQW's solicitation of borrowers in North Carolina, including through lead generation and telephone calls with North Carolina residents located in North Carolina; (4) arranging for the collection of payment in or sent from North Carolina. Because the Tribal Officials have direct personal involvement in the making and collection of the usurious loans by MQW, they are subject to personal jurisdiction under North Carolina's long-arm statute.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in North Carolina, including in this District and Division, where Plaintiff resides and applied for, obtained, and received the funds for the loan giving rise to his claims.

## PARTIES

15. Plaintiff Bronal Gary is a natural person and resident of this District and Division.

16. Defendant Kathleen Wooden Knife is a natural person residing in South Dakota. She is the President of the Tribal Council. Both as President and a general member of the Council, Defendant Wooden Knife's duties include the chartering and oversight of MQW and the other lending operations under the Tribe's control. Under the Tribe's By-

Laws, Defendant Wooden Knife is charged with the responsibility and power to "managed and administer the affairs of the Rosebud Sioux Tribe." Tribe By-Laws art. 1, § 1. In performing these duties, Defendant Wooden Knife meets at least monthly with other members of the Council to review, perform, and implement high-level management of the MQW and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks prospective relief against Defendant Wooden Knife in her official capacity.

17. Defendant Elizabeth "Lisa" White Pipe is a natural person residing in South Dakota. She is the Vice President of the Tribal Council. Both as Vice President and a general member of the Council, Defendant White Pipe's duties include the chartering and oversight of MQW and the other lending operations under the Tribe's control. In performing these duties, Defendant White Pipe meets monthly with other members of the Council to review, perform, and implement high-level management of the MQW and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks prospective relief against Defendant White Pipe in her official capacity.

18. Defendant Tonia Marshall is a natural person residing in South Dakota. She is the secretary of the Tribal Council. Both as secretary and a general member of the Council, Defendant Marshall's duties include the chartering and oversight of MQW and the other lending operations under the Tribe's control. In performing these duties,

Defendant Marshall meets monthly with other members of the Council to review, perform, and implement high-level management of the MQW and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks prospective relief against Defendant Marshall in her official capacity.

19. Defendant Louis "Wayne" Boyd is a natural person residing in South Dakota. He is the treasurer of the Tribal Council. Both as treasurer and a general member of the Council, Defendant Boyd's duties include the chartering and oversight of MQW and the other lending operations under the Tribe's control. In performing these duties, Defendant Boyd meets monthly with other members of the Council to review, perform, and implement high-level management of the MQW and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks prospective relief against Defendant Boyd in his official capacity.

20. Defendants Dolores Waln, Chris Eagle Bear, Todd Bearshield, Evastine Wright, Stanley Wooden Knife, Michelle Hollow Horn Bear, Royal Yellow Hawk, Robert Rattling Leaf, William Marshall, Wayne Frederick, Emily Boyd-Valandra, Alvin Bear Heels Sr., Shere Wright, Michael Boltz Sr., Tamaleon Wilco, Lila Kills In Sight, William "Willie" Kindle, Ben Black Bear III, Marion Little Thunder, and Charles Dubray Jr. (collectively, the "Community Representatives") are each a natural person residing in

South Dakota. They are representatives on the Tribal Council elected by the 20 recognized communities within the Tribe. As representatives on the Council, their duties include the chartering and oversight of MQW and the other lending operations under the Tribe's control. In performing these duties, the community representatives meets monthly with other members of the Council to review, perform, and implement high-level management of MQW and the other tribal lending entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the entities; and approval of agreements between each entity and nontribal coconspirators. Plaintiff seeks prospective relief against Defendant Boyd in his official capacity.

21. Defendant DRT Rosebud Lending d/b/a MyQuickWallet.com ("MQW") is an online lending company formed by the Rosebud Sioux Tribe ("Tribe").

22. The John Doe Defendants Nos. 1-15 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from MQW and the Tribe's other lending entities. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

### A. State usury and licensing laws protect consumers from usurious loans.

23. "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

24. Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both requirements, including North Carolina, *i.e.*, Plaintiff's home state from which he applied for, received, and repaid his MQW loan.

**i. North Carolina**

25. In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

26. Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

27. Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. The borrower may also recover twice the amount of any interest paid. *Id.*

28. North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

29. Unlicensed lenders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor. N.C. Gen. Stat. § 53-166(c). Additionally, the entire loan

becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

30. The CFA also declares that it applies to "any person that tries to avoid its application by any device, subterfuge, or pretense whatsoever." N.C. Gen. Stat. 53-166(b).

31. Neither MQW, the other lending entities under the Tribe's control, nor the Tribe or Tribal Officials were ever licensed to make consumer loans in North Carolina.

**ii. Other State Usury Laws**

32. Each state of residence of the putative class members in the below RICO Class definition also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[2]

---

[2] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ariz. Rev. Stat. Ann. § 44-1201-1204; Ark. Const. Art. XIX § 13; Cal. Civ. Code §§ 1916-2, 1916-3; Cal. Fin. Code §§ 22750, 22753, 22780; Colo. Rev. Stat. §§ 5-2-201, 5-5-201; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.904, 516.02; O.C.G.A. §§ 7-3-1, et seq.; O.C.G.A. § 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009); Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.J. Code §§ 31:1-1, 31:1-3N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

## B. Overview of the Tribal Lending Business Model.

33. Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

34. Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[3] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

35. Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

---

[3] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

36. It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

37. Over the years, payday lenders have used various schemes to evade applicable state and federal protections. In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates. Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

38. Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where, like North Carolina, payday lending is illegal. However, beginning in 2005, the Federal Deposit and Insurance Corporation began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

39. As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[4] the shadow payday loan industry turned to Native American tribes to

[4] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that

replace the banks as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

40. Under this new "rent-a-tribe" model, the leadership of an economically impoverished tribe would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered. In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[5]

41. For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

---

rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

[5] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

42. Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

43. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

44. Often at the table were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

45. Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received only a nominal amount of the proceeds from the loans.

46. Upon information and belief, Rosette has represented the Tribe, including in the creation and implementation of its lending activities.

47. To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

48. Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans. The loan agreements are typically structured to include a waiver of all state and/or federal rights, in favor of tribal law and dispute resolution provisions. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

49. Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

50. Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[6]

---

[6] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

51. During the last decade, federal and state law enforcement agencies have also taken various actions to combat tribal lending schemes, including by example:

a. In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[7] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[8]

b. The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

52. In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs*

---

[7] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[8] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

*v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

53. Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**C. MQW and the Tribal Council's Role in the Lending Scheme.**

54. The Rosebud Sioux Tribe is a federally recognized Native American tribe, located on the Rosebud Sioux Reservation (which is within the state of South Dakota).

55. The Tribe's Constitution establishes the Tribal Council as the Tribe's "governing body" with the power to, in relevant part: "make all economic affairs and

enterprise of the Tribe in accordance with the terms of a charter which may be issued by the Tribe by the Secretary of the Interior"; "regulat[e] the conduct of trade"; and "charter subordinate organizations for economic purposes and to regulate the activities of all cooperative associations of members of the Tribe." Tribe Const. art. IV § 1.

56. Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including MQW and at least two of its other usurious lending entities, Riverstone Lending and Three Sticks Lending.

57. On February 19, 2015, a tribal entity and parent company established MQW "with the purpose of developing, operating, maintaining and promoting a consumer lending business and associated activities." ECF 10-1 at ¶ 10.

58. According to its website, MQW only offers loans with triple digit interests and many of their products have annual percentage rates exceeding 1,000%, such as the 1095% imposed on Plaintiff's loan.

59. MQW, Riverstone Lending, and Three Sticks Lending operate in nearly every state in the United States, issuing loans to consumers through their respective websites.

60. Upon information and belief, these lending enterprises have issued millions of loans and have portfolios worth tens or potentially hundreds of millions of dollars.

61. Despite the apparent value of the lending portfolios that claim to be wholly owned and operated by the Tribe, the Tribe's own website does not identify any of the lending entities as part of its economic development initiatives.[9]

62. Nor are the tribal lending entities listed under employment opportunities for Tribe members.[10] And the Tribe does not identify any of the entities as a "Major employer" of the Tribe's members.[11]

63. By comparison, the Tribe's casino is listed under the Tribe's economic development initiatives and as an employer of Tribal members.

64. The server for MQW's website, MyQuickWallet.com, from which all of the loans issued by MQW are made, is also located in California, far from the Tribe's reservation in South Dakota, and has been linked to an IP server owned and operated by Infinity Software, a non-tribal entity that advertises its "back end" payday lending services, including, upon information and belief, software that analyzes, underwrites, services, and collects payday loans issued by MQW, Riverstone Lending, Three Sticks Lending, and several other tribal payday lenders.[12]

---

[9] Economic Development, Rosebud Sioux Tribe, https://www.rosebudsiouxtribe-nsn.gov/eco-dev (last visited Oct. 20, 2025).

[10] Employment, Rosebud Sioux Tribe (Oct. 16, 2025), https://www.rosebudsiouxtribe-nsn.gov/employment (last visited Oct. 20, 2025).

[11] History and Culture: General Information, Rosebud Sioux Tribe, https://www.rosebudsiouxtribe-nsn.gov/history-culture (last visited Oct. 20, 2025).

[12] https://infinitysoftware.com/payday-loan-software.

65. Based on the above information, the structure of nearly identical tribal lending businesses, and upon other information and belief, nontribal participants have significant involvement in the operations of, and primarily benefit from, the unconscionable payday loans issued by MQW and the other lending entities in violation of state usury and licensing laws.

66. These nontribal coconspirators are the yet-to-identified officers, operators, and investors (collectively, the "John Doe Defendants"), who manage the day-to-day operations of MQW, likely through servicing or delegation agreements.

67. To engage in this extremely profitable, but illegal business, the deliberately concealed John Doe Defendants have entered into agreements with the Tribe, the Tribal Council Defendants, MQW, Riverstone Lending, Three Sticks Lending, and the Tribe's economic development corporation and others to make and collect on usurious loans in states across the country, including in North Carolina, and to keep their identity hidden from consumers and regulators.

68. Upon information and belief, the John Doe Defendants are also the primary—if not sole—source of funds for MQW's operations, and they produce all of the leads for MQW; manage the technology and call centers that issue and service MQW's loans; collect payments on the loans; and sell off nonperforming debts.

69. Upon information and belief, each Defendant is aware of the numerous legal challenges to the tribal lending model and the illegality of making and collecting on usurious and void loans in other jurisdictions.

70. Indeed, MQW's website states that it no longer offers loans in several jurisdictions, each of which correlate with jurisdictions in which state attorneys general have challenged the loans or private class action attorneys have filed suit.[13]

71. MQW and the Tribe have also been identified for illegal conduct by state regulators, including, for example, the Washington State Department of Financial Institutions, which issued a notice in June 2025 that the Tribe "may be operating online tribal lenders," including Riverstone Lending and Three Sticks Lending, and that such lenders and the Tribe "are not licensed by DFI and are not registered to conduct business in [Washington]."

72. Additionally, each of Defendants is aware that many consumers have complained about the abusive lending practices used by MQW and other tribal lenders.

73. For example, Defendants have received consumer complaints on Rosebud Lending's Better Business Bureau ("BBB") profile that have cited MQW's practice of charging high interest on small-dollar loans.

74. Indicative of Defendants' knowledge of their unlawful conduct, the John Doe Defendants have also taken steps to actively conceal their management structure and involvement in the MQW lending scheme, including, for example, concealing the true ownership of MyQuickWallet.com behind a domain proxy service.

---

[13] *See* FAQ – Frequently Asked Questions, MyQuickWallet.com, https://www.myquickwallet.com/faq.html (last visited Oct. 20, 2025) (stating "We currently do not lend in Illinois, Arkansas, Colorado, Connecticut, District of Columbia, Georgia, Maine, Minnesota, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, South Dakota, Vermont, Virginia, Washington, and West Virginia").

75. Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee and operate MQW to facilitate the issuance of triple-digit-interest loans that violate usury laws across the country.

76. Upon information and belief, MQW, Riverstone Lending, Three Sticks Lending, and other lending entities chartered by the Tribe operate under the oversight of the Tribal Council Defendants, without whose approval and legal sanction MQW could not operate.

77. The Tribal Council Defendants continue to facilitate the illegal lending scheme by allowing MQW and the other lending entities to make and collect on usurious and void loans in multiple jurisdictions, including North Carolina. Neither MQW nor the other lending entities could operate without the tribal façade that the Tribe provides, and the Tribal Council Defendants could easily prevent the lending entities from collecting further amounts on their usurious loans.

78. Upon information and belief, none of the Defendants have applied for a consumer lending license any state with such laws.

79. MQW's website includes the following disclaimer:

> Rosebud Lending DRT, is the tribal lending agency of Rosebud Lending, a subsidiary agency of the Rosebud Economic Development Corporation, an economic development arm and entity of the Rosebud Sioux Tribe, a sovereign nation located within the United States of America and operating within the Tribe's reservation.

80. Despite these representations, Plaintiff is unable to locate any information regarding MQW's operations within the Tribe's reservation.

81. Defendants' attempts to evade state usury protections also extend to the form MQW consumer loan agreements, which prospectively waive the application of all federal and state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision, stating, *inter alia*, that "None of this Line of Credit, the Line of Credit Agreement, nor Lender, is subject to the laws of the United States or any state therein."

82. As such, the form agreements purport to strip consumers like Plaintiff of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including North Carolina, which have a long and robust history of precluding usurious lending operations like MQW's that burden their citizens with insurmountable debts.

83. The form agreements further purport to prospectively waive the application of any federal remedies and rights enacted by Congress, including the remedies available under RICO, which prohibits the collection of unlawful debts such as those issued to Plaintiff and the class members here.

84. Thus, under the terms of their loan agreements, the putative class members prospectively waive any and all rights and remedies available to them under state and federal law, which violates the prospective waiver doctrine and nullifies the arbitration and choice-of-law provisions.

85. Upon information and belief, the loan contracts issued to all putative class members by MQW and the other tribal lending entities were substantively identical and all

included the same unlawful prospective waiver of the class members' state and federal rights.

**D. Plaintiff's Experience.**

86. Taking advantage of the ostensible protections created by the tribal business model, upon information and belief, the interest rates charged on the loans issued to the putative class members were far more than twice the allowable interest rate permitted by state usury and licensing laws in Plaintiff's and the class members' respective states of residence.

87. For example, Plaintiff applied for and obtained a loan—self-described as a "Revolving Line of Credit"—from MQW in March 2025 from his home in North Carolina for a principal amount of $500, which had an interest rate of 1095%, far exceeding North Carolina's 16-percent interest rate cap for loans issued by written contract.[14] Plaintiff paid back more than he borrowed on this loan from his bank account maintained in North Carolina.

88. Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Council Defendants, MQW, or the other tribal lending entities has ever obtained a license to issue loans to consumers in any state, including North Carolina, let alone a license to issue the triple-digit interest loans to Plaintiff and the putative class members.

---

[14] A copy of Plaintiff's loan contract is attached hereto as Exhibit 1.

89. Plaintiff and the putative class members applied for their loans on the internet while located in their respective states of residence. Upon information and belief, none of them ever traveled to the Tribe's reservation to obtain their loans.

90. Plaintiff and the putative class members all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

91. As outlined above, the loans issued to Plaintiff and the putative class members violated the respective usury statutes of each of their home states and entitle Plaintiff and the class to the remedies provided under those states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.[15]

---

[15] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the

92. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiff.

### E. The Loan Contract's Arbitration Agreement, including its Delegation Clause, is Unenforceable under the Prospective Waiver Doctrine.

93. The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Hengle*, 19 F.4th at 334 (quoting 9 U.S.C. § 2).

94. One such defense "is the so-called 'prospective waiver' doctrine, under which an agreement that prospectively waives 'a party's right to pursue statutory remedies' is unenforceable as a violation of public policy." *Hengle*, 19 F.4th at 334 (*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)).

---

unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

95. Put differently, "[a]lthough parties possess broad latitude to specify the rules under which their arbitration will be conducted, they must preserve the ability to assert federal statutory causes of action so that 'the statute[s] will continue to serve both [their] remedial and deterrent function[s].'" *Hengle*, 19 F.4th at 334 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)).

96. There are at least six decisions from the Fourth Circuit labeling similar tribal arbitration contracts to those at issue here a "farce," designed specifically "to avoid state and federal law," and deployed "to game the entire system." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-76 (4th Cir. 2016); *see also Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. July 21, 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. July 21, 2020); *Dillon v. BMO Harris Bank*, 856 F.3d 330 (4th Cir. 2017); *Hengle*, 19 F.4th at 349; *Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023).

97. The contracts in this case are no different. Although members of a different enterprise now seek their enforcement, the contracts' terms are materially indistinguishable from the ones that have been repeatedly struck down by the Fourth Circuit.

98. Most notably, Plaintiff's loan contract contains an express waiver of federal and state law in a "Governing Law" provision, which provides as follows: "**This Line of Credit Agreement is governed by the laws of the Rosebud Sioux Tribe, a sovereign nation located within the United Sates of America. The Line of Credit Agreement is not consummated until your Line of Credit is funded by us from our tribal bank account, and your Line of Credit is repayable to that same account. <u>None of this Line</u>**

**<u>of Credit, the Line of Credit Agreement, nor Lender, is subject to the laws of the United States or any state therein</u>.**" Exhibit 1 at pg. 3 (bold in original, underline added).

99. This prospective waiver of federal law renders the entire arbitration agreement (delegation clause included) unenforceable.

100. The Fourth Circuit's recent decisions confirm this settled rule. For example, in *Haynes Investments* and *Sequoia*, the Fourth Circuit squarely rejected the defendants' arguments that "any threshold questions as to the enforceability of the arbitration agreements should have first been sent to an arbitrator." *Haynes Invs*., 967 F.3d at 337; *Sequoia*, 966 F.3d at 290.

101. In *Hengle*, the Fourth Circuit again addressed this issue, writing: "[t]his is not the first time this Court has encountered a prospective waiver challenge to an arbitration provision with a delegation clause in a tribal lending agreement." *Hengle*, 19 F.4th at 336.

102. The Fourth Circuit further noted that "[i]n four prior cases," it had "assessed arbitration provisions requiring application of tribal law to the practical exclusion of other law and, in each case," it "held the arbitration provision (including the delegation clause) invalid as a prospective waiver" of substantive rights. *Id*. (citation omitted).

103. Against this backdrop, the Fourth Circuit determined that there was "no material distinction between the case at hand" and its prior precedent because "the choice-of-law clauses of the arbitration provision operate as a prospective waiver twice over, waiving not only a borrower's right to pursue federal remedies… but also the very federal and state defenses to arbitrability that preserve that right." *Id*. at 339 (emphasis added).

104. In addition to violating the prospective waiver doctrine, the arbitration agreement (including the delegation provision) is unenforceable for several other reasons.

105. First, the arbitration contract here lacks consideration because it is one-sided, *i.e.*, MQW did not agree to be bound by the terms.

106. Instead, the loan contract specifically provides that "NOTWITHSTANDING THE FOREGOING, THE LENDER RETAINS THE AUTHORITY TO INSTITUTE AN ACTION IN ANY COURT TO RECOVER SUMS DUE THE LENDER BY CUSTOMER HEREUNDER." Exhibit 1 at 6.

107. This one-way promise to arbitrate disregards "rudimentary contract law that an agreement lacks consideration, and is therefore never formed, when it consists of illusory promises." *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 178 (4th Cir. 2025). Where, as here, "one side can avoid all of its obligations, the [arbitration] agreement lacks the kind of basic reciprocity that is necessary to form a binding contract." *Id.*

108. Second, the arbitration contract is also illusory, unconscionable, and violates the prospective waiver doctrine because the terms of the contract state that the "[a]rbitration shall be conducted in the Rosebud Sioux Tribe by an authorized representative in accordance with its consumer dispute rules and the terms of this Waiver of Jury Trial and Arbitration Provision." Exhibit 1 at pg. 6.

109. The Rosebud Sioux Tribe, however, does not have any "consumer dispute rules." Rather, the Rosebud Sioux's Consumer Financial Services Regulation establishes unconscionable procedures for resolving disputes. *See* ECF 10-1 at pg. 161.

110. The Rosebud Sioux's Consumer Financial Services Regulation also mirrors the tribal codes found to prospectively waive borrowers' rights in multiple decisions.

111. Upon information and belief, Plaintiff's loan contract is a standard form contract used by MQW and the Tribe's other lending entities. Plaintiff on behalf of himself and all similarly situated, seeks a declaratory judgment that these arbitration agreements are unenforceable for the reasons explained above.

112. Plaintiff also seeks a declaratory judgment, on behalf of himself and all similarly situated, that the Governing Law clause in his loan contract is unenforceable because it: (1) violates the prospective waiver doctrine; and/or (2) cannot be enforced as a matter of public policy. Plaintiff further seeks a declaratory judgment, on behalf of himself and all similarly situated, that state law applies to the loan contracts originated by MQW and the Tribe's other lenders.

**F. The loan contracts waive MQW's potential sovereign immunity.[16]**

113. Native American tribes "possess a unique status in our federal system." *Hengle v. Treppa*, 19 4th 324, 345 (4th Cir. 2021). "As 'domestic dependent nations,' they 'exercise inherent sovereign authority,' yet they are 'subject to plenary control by Congress.'" *Id.* (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014).

114. One of the "core aspects of sovereignty" afforded to tribes is the immunity from suit, and "[a]bsent waiver or congressional abrogation, tribal immunity extends even to suits arising from a Tribe's commercial activities off tribal lands." *Id.* (citation omitted).

[16] Plaintiff does not concede that MQW meets the arm of the tribe test. The burden of proof on this issue, however, falls on MQW.

115. Here, MQW has waived its immunity in at least two ways.

116. First, the Governing Law section of the contract unequivocally provides that "None of this Line of Credit, the Line of Credit Agreement, nor Lender, is subject to the laws of the United States or any state therein**.**" Exhibit 1 at pg. 3.

117. By disclaiming the application of any federal laws to the contract or the "lender," this clause is a clear expression that MQW has waived its immunity as it is entirely derivative of "the laws of the United States."

118. If the laws of the United States do not apply to the contract, then a subset of those laws, such as sovereign immunity, equally do not apply.

119. Furthermore, MQW has waived its sovereign immunity by agreeing to arbitration of all claims against it.

120. As one court has explained in a case involving the Rosebud Sioux Tribe: "By designating arbitration in accordance with specified arbitration rules as the forum for dispute resolution, the parties clearly intended a waiver of sovereign immunity with respect to resolving disputes under the contract. By definition such disputes could not be resolved by arbitration if one party intended to assert sovereign immunity as a defense." *Rosebud Sioux Tribe v. Val-U Const. Co. of S. Dakota*, 50 F.3d 560, 562 (8th Cir. 1995).

121. By clearly manifesting an its "intent to resolve disputes by arbitration, and the Tribe waived its immunity with respect to any disputes under the contract." *Id*. at 563.

122. Indeed, the Tribal Council Defendants have conceded that the "only waiver of immunity in this matter is MQW's limited waiver of immunity for arbitration." ECF 10 at 20.

123. Its waiver, however, extends further than the Tribal Council Defendants contend because arbitration is nothing more than a specialized forum-selection clause.

124. Arbitration, in other words, "does not alter or abridge substantive rights; it merely changes how those rights will be processed." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022).

125. Because MQW has waived its immunity to suit, that waiver applies regardless of the forum processing the dispute.

126. Indeed, the contract itself even acknowledges that Plaintiff could sue in "**A SMALL CLAIMS TRIBUNAL**," although that term is undefined in the contract. Exhibit 1 at pg. 6 (emphasis in original).

127. For the foregoing reasons, MQW has waived any immunity from suit for the Plaintiff's claims.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST MQW)**

128. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

129. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for himself and on behalf of a class—the "RICO Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with MQW, Riverstone Lending, or Three Sticks Lending; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania,

> Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin or Wyoming; and (3) repaid more than the principal balance of the loan.

Plaintiff is a member of this class.

130. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for himself and on behalf of a subclass—the "MQW Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with MQW; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin or Wyoming; and (3) repaid more than the principal balance of the loan.

Plaintiff is a member of this class.

131. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MQW, Riverstone Lending, Three Sticks Lending, and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

132. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's

usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against MQW. These questions predominate over the questions affecting only individual class members.

133. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

134. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and she has and intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor his counsel have any interests which might cause them to not vigorously pursue this action.

135. RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

136. The Supreme Court's decision in *Boyle v. United States* recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

137. Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

138. An association-in-fact enterprise merely requires three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946.

139. Here, Defendants have established an enterprise an association-in-fact enterprises for the purpose of collecting unlawful debts.

140. The MQW, Riverstone Lending, Three Sticks Lending, the Tribal Council Defendants, along with the John Doe Defendants, Tribe and others, were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Organization" or "the Enterprise."

141. The Usurious Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

142. The members and associates of the Usurious Lending Organization shared various common purposes, including the evasion of state usury and licensing law, the operation of the "MyQuickWallet.com," "Riverstone Lending," and "Three Sticks Lending" websites, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

143. The Usurious Lending Organization assigned specific roles to the members and associates. The John Doe Defendants designed and directed, funded, and reinvested in the Usurious Lending Organization and distributed the revenues generated in accordance with the said written agreements.

144. The role of the Tribal Council Defendants was primarily to establish and organize the tribal façade for the Usurious Lending Organization and to take various measures designed to reinforce the fiction that the Usurious Lending Organization is a tribal-run business, including chartering the entities, sanctioning their operations under the Tribe's name, and continuing to perpetuate the tribal façade that allows the lending entities to attempt their evasion of state usury laws and other federal and state substantive rights.

145. The Usurious Lending Organization has had a longevity sufficient to originate and collect tens of thousands of illicit loans.

146. The Usurious Lending Organization has been engaged in, and its activities affected, interstate commerce. The Tribal Council Defendants perform their roles from the tribal lands in South Dakota but the John Doe Defendants who are operating the Usurious Lending Organization do so, upon information and belief, from locations in other states,

including California. The Usurious Lending Organization sends loan proceeds into and collects payments from locations throughout the United States.

147. The Tribe established these lending entities under a common scheme to establish multiple lending fronts that would allow the Tribe to generate revenue while permitting nontribal coconspirators, including Defendants, to share in the revenue generated from the lending entities.

148. Defendants participated in and coordinated their efforts behind this common scheme, including, upon information and belief, through the sharing of resources among the lending entities, including technical, underwriting, and operational support; the sharing of funding; and the sharing of marketing efforts, including through the joint and/or shared purchase of borrower "leads" from credit reporting agencies and subsequent targeting of mailing and other advertising to those individuals.

149. Defendants also jointly benefitted from each other's involvement in the enterprise by sharing the risks of such an obviously illegal enterprise among multiple entities and individuals, who could jointly front the costs of such risks, including any legal judgment.

150. Alternatively, and at a minimum, the Tribal Council Defendants, John Doe Defendants, MQW, and others entered into an association in fact enterprise to operate, fund, and manage MQW for the express and knowing purpose of issuing usurious loans to consumers nationwide under the MQW tradename (the "MQW Enterprise"). MQW is thus liable to each of the MQW Subclass members for its role in the MQW Enterprise.

151. RICO defines “unlawful debt” as a debt which was incurred in connection with “the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.” 18 U.S.C. § 1961(6).

152. MQW violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise’s affairs in the collection of unlawful debt.

153. MQW has participated in the operation and management of the affairs of the Enterprise and/or MQW Enterprise by: (1) creating, implementing, and furthering the tribal lending scheme; (2) working in tandem with others, including the Tribal Council Defendants and non-tribal participants, to issue the usurious loans and collect them; (3) entering into revenue sharing agreements whereby the revenues are distributed; (4) by possessing and asserting significant authority and influence the lending portfolio; and (5) knowingly setting up its company and operating it with sole purpose to collect illegal debts, thereby causing those acts to occur and reaping the benefits therefrom.

154. All of the loans made to Class members and collected by MQW and Defendants’ co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

155. As alleged, each of Defendants participated in the collection of unlawful debt.

156. Plaintiff and the RICO Class members were injured as a direct result of MQW’s violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful

debt to the Usurious Lending Enterprise and/or MQW Enterprise, which money transfers would not have been made but for MQW's conduct.

157. Accordingly, MQW is liable to Plaintiff and the RICO Class and/or MQW Subclass for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**<u>COUNT TWO</u>:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST MQW)**

158. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

159. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for himself and on behalf of the RICO Class and MQW Subclass defined in Count One.

160. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MQW, Riverstone Lending, Three Sticks Lending, and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

161. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's

usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

162. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

163. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative classes because his interests coincide with, and are not antagonistic to, the interests of the members of the classes he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor his counsel have any interests which might cause her to not vigorously pursue this action.

164. MQW violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring with the Tribal Council Defendants, Redco, and others to violate § 1962(c).

165. MQW, its officers, and employees knowingly agreed to participate in the scheme alleged herein that allowed the Usurious Lending Organization and/or MQW

Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

166. MQW, its officers, and employees had knowledge of the essential nature of the plan to collect usurious debts, and MQW has facilitated the scheme by serving as the entity who provides the loans and collects the same.

167. Plaintiff and the RICO Class and MQW Subclass members were injured as a result of MQW's violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

168. Accordingly, MQW is liable to Plaintiff and the respective Class Members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE
## NORTH CAROLINA CONSUMER FINANCE ACT, N.C. GEN. STAT. § 53-166 (CLASS CLAIM AGAINST MQW FOR MONETARY DAMAGES AND AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)

169. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

170. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for himself and the following class, the "North Carolina Damages Class," initially defined as:

> All natural persons who: (1) entered into a loan agreement with MQW, Riverstone Lending, or Three Sticks Lending; (2) from North Carolina, and (3) who paid any amount on their loan.

Plaintiff is a member of this class.

171. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for himself and the following class—the "North Carolina Injunctive Class"—and against the Tribal Council Defendants in their official capacities, initially defined as:

> All natural persons who: (1) entered into a loan agreement with MQW, Riverstone Lending, Three Sticks Lending; (2) from North Carolina, and (3) with an outstanding balance on their loan.

Plaintiff is a member of this class.

172. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by MQW, Riverstone Lending, Three Sticks Lending, and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

173. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether MQW and/or Defendants engaged in the offering, arranging, and making of loans of $25,000 or less to North Carolina consumers; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether MQW and/or Defendants had licenses to issue loans to North Carolina consumers; (4) whether MQW or the Tribal Council Defendants are entitled to sovereign immunity; and (5) the propriety of injunctive relief for Plaintiff and the class members against each Defendant.

174. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

175. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative classes because his interests coincide with, and are not antagonistic to, the interests of the members of the classes he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor his counsel have any interests which might cause her to not vigorously pursue this action.

176. As alleged above, the Tribal Council Defendants as the Tribe's "governing body" with the power to, in relevant part: "make all economic affairs and enterprise of the Tribe in accordance with the terms of a charter which may be issued by the Tribe by the Secretary of the Interior"; "regulat[e] the conduct of trade"; and "charter subordinate organizations for economic purposes and to regulate the activities of all cooperative associations of members of the Tribe." Tribe Const. art. IV § 1.

177. Pursuant to the Tribe's Constitution and the laws of the Tribe, the Tribal Council Defendants direct, control, and oversee the economic affairs and enterprises of the Tribe, including MQW, Riverstone Lending, and Three Sticks Lending.

178. The Tribal Council Defendants have engaged in the business of lending or servicing loans in amounts of $25,000 or less, and have contracted for, exacted, and

received—both directly and indirectly through their control of MQW—in connection with such loans charges in excess of those permitted by Chapter 24 of the General Statutes.

179. MQW—which is ultimately controlled by the Tribal Council Defendants—has also issued loans of $25,000 or less to Plaintiff and the North Carolina Injunctive Class members without first having obtained a licensed from the North Carolina Commissioner.

180. At all times relevant to this Complaint, neither MQW, nor the Tribal Council Defendants have not conducted business under the authority of any law of North Carolina or of the United States related to banks, trust companies, savings and loan associations, cooperative credit unions, agricultural credit corporations or associations organized under the laws of North Carolina, production credit associations organized under the Farm Credit Act of 1933, pawnbrokers, industrial banks, real estate lenders, or installment papers defined in G.S. 105-83.

181. MQW and the Tribal Council Defendants' conduct constitutes a violation of N.C. Gen. Stat. § 53-166(a) such that the loans issued to the class members are void under § 53-166(d).

182. MQW and the Tribal Council Defendants are further prohibited from "collect[ing], receiv[ing], or retain[ing] any principal or charges whatsoever with respect to the loan[s]."

183. Accordingly, Plaintiff and the putative class members in the North Carolina Damages Class are entitled to damages from MQW for all amounts paid on their loans, and their attorneys' fees and costs.

184. Further, Plaintiff and the North Carolina Injunctive Class are entitled to an injunction against the Tribal Council Defendants in their official capacity prohibiting the further collection and receipt of any amounts on their loans.

## COUNT FOUR
## NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1.1
## (CLASS CLAIM AGAINST MQW FOR MONETARY DAMAGES AND AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)

185. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

186. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for himself and the following class, the "North Carolina Damages Class," initially defined as:

> All natural persons who: (1) entered into a loan agreement with MQW, Riverstone Lending, or Three Sticks Lending; (2) from North Carolina, and (3) who paid any amount on their loan.

Plaintiff is a member of this class.

187. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff also brings this claim for himself and the North Carolina Injunctive Class defined in Count Three. Plaintiff is a member of this class.

188. North Carolina's Unfair and Deceptive Trade Practices Act prohibits "unfair and deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. 75-1.1(a).

189. MQW and the Tribal Council Defendants committed multiple unfair and/or deceptive acts within the State of North Carolina by facilitating the collection of usurious

loans that the State of North Carolina has declared immoral, unethical, oppressive, unscrupulous, and unconscionable, including but not limited to:

a. Facilitating the making of payday loans to residents of North Carolina after the law authorizing such payday lending expired and in knowing violation of North Carolina law and public policy;

b. Collecting amounts from bank accounts in North Carolina and held by citizens of North Carolina on the ACH Network for loans that Defendants knew were originated without a license required by North Carolina law;

c. Representing to consumers that the loan contracts were not subject to state law, including state usury protections, when they knew that was not the case in North Carolina, including under the express terms of North Carolina law and multiple rulings by the Fourth Circuit; and,

d. Representing to consumers that the loan contracts were not subject to federal law;

e. Collecting amounts from bank accounts in North Carolina and held by citizens of this State for loans that Defendants knew were usurious when issued and violated the public policy of North Carolina and nearly every other U.S. state.

190. With the sunset of N.C. Gen. Stat. § 523-281, payday lending is no longer authorized under North Carolina law, and the issuance of payday loans are contrary to North Carolina public policy.

191. Nonetheless, MQW and the Tribal Council Defendants have continued to issue and collect on loans that are both payday loans and far exceed North Carolina's usury rate.

192. MQW and the Tribal Council Defendants' conduct affects commerce within North Carolina and nationwide, including through the interstate transfer of funds from bank accounts maintained by citizens of North Carolina to accounts maintained and controlled by MQW (and ultimately Tribal Council Defendants).

193. MQW and the Tribal Council Defendants' conduct has caused and continues to cause ongoing harm to Plaintiff and the members of the putative class, including the loss of funds to each lending entity on loans that Defendants knew violated North Carolina law at the time of inception.

194. Accordingly, Plaintiff and the putative class members in the North Carolina Damages Class are entitled to damages from MQW for treble the amounts paid above the principal balance of their respective loans, and their attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1.

195. Plaintiff and the putative class members in the North Carolina Damages Class are further entitled to an injunction against the Tribal Council Defendants in their official capacities barring the further collection of their loans.

## <u>COUNT FIVE</u>
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
## (CLASS CLAIM AGAINST THE TRIBAL COUNCIL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)

196. Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs.

197. Pursuant to Rule 8(d)(2), Plaintiff alleges that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

198. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this claim for himself and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with MQW, Riverstone Lending, or Three Sticks Lending; (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Indiana, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiff is a member of this class.

199. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff also bring this claim for himself and the following subclass—the "North Carolina Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with MQW, Riverstone Lending, or Three Sticks Lending; (2) from North Carolina, and (3) have an outstanding balance on their loan.

Plaintiff is a member of this subclass.

200. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical. The names

and addresses of the class members are identifiable through the internal business records maintained by Defendants, Riverstone Lending, and Three Sticks Lending, and the class members may be notified of the pendency of this action by published and/or mailed notice.

201. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws governing the loans; (4) whether the loans are void under the respective state laws governing the loans; (5) whether the arbitration provisions in the loan agreements are void and/or unenforceable; (6) whether the choice-of-law provisions in the loan agreements are void and/or unenforceable, and (7) whether Plaintiff and the class are entitled to declaratory relief.

202. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

203. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to

continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff nor his counsel have any interests which might cause them to not vigorously pursue this action.

204. Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Indiana, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

205. None of the Defendants, nor Three Sticks Lending or Riverstone Lending, were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Indiana, Kansas, Minnesota, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

206. Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

207. Further, as explained in detail above, the arbitration provision in Defendants' form loan agreements is unenforceable under the prospective waiver doctrine, for lack of consideration, and/or as an unconscionable and illusory provision.

208. Similarly, the choice-of-law provision in the form loan agreements is also invalid and unenforceable as a prospective waiver of federal and state substantive rights and remedies and/or as a violation of public policy of North Carolina and other states against unregulated usurious lending.

209. Plaintiff and members of the classes are subject to ongoing harm absent a declaration that the loans and relevant provisions are void and/or unenforceable, including

the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

210. The dispute and controversy are a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and arbitration provisions.

211. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

212. Accordingly, Plaintiff seeks a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable.

213. Plaintiff further seeks a declaration that the arbitration and choice-of-law provisions are void and/or unenforceable as a matter of law.

214. Further, Plaintiff seeks to enjoin the Tribal Council Defendants, in their official capacities, from allowing collection on the loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiff as class representative and his counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying

class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order declaring the loans issued to the Void Debt Class and North Carolina Void Debt Subclass, and the arbitration and choice-of-law provisions in the same, to be void and unenforceable;

E. An Order providing for any and all injunctive relief the Court deems appropriate, including the prohibition of any collection of the unlawful loans;

F. An Order awarding monetary damages only as to MQW, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

G. An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

H. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I. An Order awarding Plaintiff his reasonable costs and expenses of suit, including attorneys' fees; and

J. Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Respectfully submitted,
**PLAINTIFF**, *individually and on behalf of all others similarly situated*

_/s/ Andrew J. Guzzo_
Andrew J. Guzzo*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: aguzzo@kellyguzzo.com

**Notice of Special Appearance Attorney for Plaintiff*

By: _/s/ Rashad Blossom_
Rashad Blossom (State Bar No. 45621)
Blossom Law, PLLC
126 N. McDowell St., 2nd Floor
Charlotte, NC 28204
rblossom@blossomlaw.com

*Local Rule 83.1(d) counsel for Plaintiff*